Good morning, ladies and gentlemen. We'll hear the first case on the calendar, United States v. Rutherford. Judge Rustani and I are here. Judge Fletcher is on the phone in Seattle and will participate in the oral argument. Counsel, please proceed. If I may begin, my name is Kevin Murch, Your Honor. I'm here on behalf of the Rutherfords. I represent them with my wife, who is also my partner. Good morning, and it's nice to see you again. We've been here before. Yes. Good morning, counsel. This case is the – Good morning to you and to Judge Fletcher. I'm sorry? I said good morning to you and to Judge Fletcher. Oh. I hadn't seen her this morning until now. Okay. And I meant to say – We can see Judge Fletcher on our cameras here, whatever these machines are. I don't know whether you can see Judge Fletcher. Yes, I can see her. And good morning. Oh, good. All right. Well, we can all see each other. Now you may proceed. Thank you. We're here again. The facts of this case actually go back now more than 10 years. I think the first time I was here, I talked about we've been going through this case for about 10 years. Well, you really don't have to talk about too much other than what's happened since we last met. And that is the district court's decision with respect to the glaring and what the effect was on the jury, was or was not on the jury. Okay. We had a hearing. And during the hearing, we brought in a number of jurors. There was also a person, a witness that was brought in because one of the jurors had died and he was allowed to give some testimony. We brought in the private investigator who had obtained the information initially and discussed the matters with the jurors, and his wife, who had attended one of the meetings with one of the jurors that prompted her to provide initially an affidavit. The judge read. There's a two-part test, the way that I understand this. And Judge Reed did find that there was tampering, but then did not find that it had essentially affected the outcome. He found the government rebutted the presumption. Rebutted the presumption. And then we appealed, and we appealed basically the part of his ruling where he applies the Chapman test instead of the Chapman and Elias test, instead of applying the Henley test, a test that I know that you are acquainted with. And the manner in which he applied the test is he stated that, and I quote, he stated that the Supreme Court holds, in Chapman v. California, the Supreme Court holds that there is little, if any, difference between the statement, whether there is a reasonable possibility that the evidence complained of might have contributed to the conviction and a reasonable doubt that the error complained of did not contribute to the verdict complained of. Then the Chapman case adopts the appropriate test for harmless error beyond a reasonable doubt, because as we know, once you get past the initial, the first part of the test, there's a presumption where the burden shifts to the government, and then the government has to prove beyond a reasonable doubt that it essentially hasn't affected, affected things. And they say that's the key, I think, what affected things means. Exactly. And what we, the way we approached it, we went to what the Court had said in the Rutherford case to us, and the Court in the Rutherford case had said that essentially the Court, if there's any risk that, if there's any risk that the jury is affected in any way, not the verdict, not the verdict being affected, but the jury being affected in any way, then, then we should get a new trial. And I believe that's a correct standard, and I'll tell you why I think it's a correct standard. In this case, there's been some statements pled, and I was there for the trial where people have said that there was only one juror who came out and said that she saw people staring. There was up to 18 people sitting in the courtroom watching and staring at jurors. They were on this wall. I was standing back here. I couldn't be in the pit. I had my, I would have, you know, my presentations and my things. They would have to look this way, and they would look at the prosecution. And when they would look at the prosecution, they would see eight, up to 18. I don't think it was 18. I think it was around 10. And these people were, these people were staring. We brought in, we brought, we tried a good case. You know, there are times when we all know, as lawyers, we're going to lose a case, and we try a great case, and we're going to lose it, and we're going to walk away. And we feel terrible, but we get over it. How do you feel this morning? I feel terrible. I feel, you know, I woke up this morning afraid. And I told Judge Reed, I'm afraid every time I go to court, because this has prompted into my mind, there's so much power, and there's so much importance in what we do. Look at this. This, the reason, when I first started as a lawyer 25 years ago or 20 years ago, I came into this room the first time I was here, and I thought, why do we do this? I now understand why we do this. It's very honorable. I think it's the most important thing that we do. So we sit jurors for the first time in their lives against a wall, and we say to these jurors that listen to the facts, and we're going to rule. We find out after we bring in four experts, the four best experts in town, because this is a dispute that involves the IRS fighting with this couple. They're fighting already. Okay? So it's they're in a fight that looks like there's a vendetta. The question in this case is basically whether this staring that Judge Reed found constituted an intrusion or invasion, whether that had ‑‑ whether the government rebutted the presumption that that had an effect on the jury. The question is, why was Judge Reed wrong in saying that it did not have an effect on any juror? Because he applied a standard that under ‑‑ he applied a standard that looked at 606B and said he asked each ‑‑ he asked the jurors, did this have an effect upon you? Now, the jurors gave us affidavits at one point in time that said ‑‑ Well, let me make it more specific. You say it does not have to have an effect on the verdict, but only on the juror. I think the standard is all we can look at is what's in their minds. We can't ask them that question, did you vote differently? And I think in his ruling that he asked that question, did you vote differently? And again, they're sitting in a room with IRS people after they've given affidavits and even ‑‑ we even brought in people who attended the affidavits who said these people said, I'm afraid, I can't lose my house. I can't lose my house. My family and I, we have ‑‑ we have ‑‑ our whole lives earned this, and I don't want to give you an affidavit, I don't want to come to court, I'll lose my house. A question was asked. I'm sorry. Judge Fletcher has a question. I'm sorry, Judge Fletcher. What we're looking at is whether this conduct of staring is actually tampering. Now, would these people have been afraid of the IRS if there hadn't been any IRS people in the room? It seems to me you're saying that they would be. No. I don't ‑‑ I don't think they would ‑‑ I think there's a natural fear, I agree with you, of the IRS, but I think that if there weren't ten people in the room, is what I think, ten people in the room staring at them, there wouldn't have been a problem, especially based upon the comments they made. There are certain comments made that would lead you to believe they were going to acquit. For instance, there's a comment when they go into ‑‑ before they go into deliberations and they say, are we going to be audited if we acquit, a statement like that, okay? Are we going to be audited if we acquit? And they wouldn't have ‑‑ I'm sorry. Counsel, I don't think you're quite directing yourself to the right issue. If there had been no IRS folks in the room, would they have made these same type of comments? Because maybe they would. I don't believe they would have. I don't. I don't believe they would have. Because ‑‑ because what they were ‑‑ what was happening is there was an on ‑‑ there were statements like, if they can do what they did to the Rutherfords, then think of what they can do to us. And while they have that, they have ten people in the room, and then we have one juror sitting there saying that they stared at me for one whole week. One week. All I need is one juror to at least get a new trial. Now, for one ‑‑ for one week, if somebody is staring at me and they have to look past me, at least for peripheral vision, have to look past me, and for a week they're looking at me or looking at the IRS, they're not listening to me. They're not listening to my experts. I brought in four experts. They brought in ‑‑ they brought in a summary witness that just said, I listened to what happened in trial and this is what happened. I brought in four experts, certified public accountant witnesses, to say that what had happened was correct. There were two attorneys on our side, myself and someone else, who tried a number of cases and has been here a number of times. We left that courtroom very, very confident. But what ‑‑ there was something that triggered the difference. And the test is, did it in any way affect ‑‑ did it affect in any way that jury, in any way? Did for one second, for one second, was did a juror look, see an IRS guy looking at her and not hear Mr. Granada, one of the CPAs, say, I've gone through and checked everything and they owe the Rutherfords $111,000? Which the testimony was, $111,000. Then three other CPAs got up and said, these people are not owed or do not owe any money to the government. Can I ‑‑ I want to ask a follow‑up question. It seems your argument is that it's not just the jurors being affected at the time of the verdict. Your contention is that we look to whether the jurors are affected at any time during the trial. But I want to go back to Judge Fletcher's question. In this case, did the district court attribute the staring to the effect on the jurors? Did he make that finding? Or did he just ‑‑ he found they were affected. They were by the IRS. But do you find it was the staring that affected them? Did he make that finding? He says at the time. Because you're saying ‑‑ because we know that he ultimately found that they weren't affected at the time of the verdict. But I want to know if he found that they were affected by the staring at earlier times. Am I in the ballpark of your question, Judge? Yeah, yeah. In fact, I have it right here. That's why. Okay. He said we conclude on the basis of that test that the staring by the IRS agent at specific jurors, not just one, was sufficiently serious that it might prejudice the jurors. The staring was potentially prejudicial. We therefore find the presumption of prejudice arises. We then turn to the question of whether the government has rebutted the presumption of prejudice by proving conduct involved. Thus, the staring is harmless beyond a reasonable doubt. And you raise a very good question twice now. There's been a finding that the staring satisfied the first part of the test. Now we go to the second part of the test, and all we have in the second part of the test is do we apply Chapman or do we apply Henley? I'm partial to Henley. Henley says that if any time during the case there's a possibility that there could be a possibility, we have to prove beyond reasonable doubt that there's no risk, there's no possibility that anybody's affected. We have one juror that says that for one full week that she was intimidated by this, one full week. I think these people have a right, especially under the facts of the case. If you take a look at the facts of the case, you bring in four experts, not four out-of-town people paid money. These are expert CPAs that do this in Reno, Nevada, highly thought of people. They come in and they say these people owe no money. They did the right thing. They had a bad break. There was a dispute between the government and them. They hit the wrong side of the deal. And then you don't get an acquittal. So for the first time in a career, I'm not the greatest lawyer in the world, but I try hard. And we went through and we talked to these people. And these people said we were intimidated. We were afraid. Those words are used throughout this case. And, in fact, despite what is said ---- Thank you for reminding me. I usually blow that.  Good morning, Your Honors. May it please the Court. My name is Michael Karam. I'm an attorney with the Tax Division, United States Department of Justice. The ultimate question here, Your Honors, is whether the Rutherfords received a fair trial. Whether they received a trial presided over by a fair and impartial jury. And the veteran district court judge in this case carefully and scrupulously followed this Court's earlier opinion, referring to it on several occasions as its blueprint in deciding how to resolve the issues in this case. He concluded that while this Court's very low threshold of a presumption of prejudice applied, the government had rebutted the presumption by establishing beyond a reasonable doubt that the error was harmless. Thus, he ultimately concluded that there was no cognizable intimidation or tampering which occurred, and he denied the defendant's motion for a new trial. Counsel? Counsel? I've had two questions. Counsel? Yes, Your Honor. How did you rebut that presumption? Your Honor, the ---- Did you want this page? The one we just sent? The district court took this Court's blueprint and asked that ---- Counsel, I'm asking what the government did to rebut the presumption. What the government did to rebut the presumption, Your Honor, was we called the government called the eight, 11 remaining living jurors to the stand. And those eight jurors, together with the three other jurors whom the defense had called, testified. And the district court here found that all 11 remaining living jurors testified unconditionally, unhesitatingly, and resolutely, and in the Court's view, credibly, that the conduct of the IRS agents did not affect the outcome of the case. And found the staring harmless on that basis. The Court also found the staring was harmless beyond a reasonable doubt because there was no credible basis to infer here in the circumstances that the jurors would have hesitated to act because of the staring and its effects in matters of such importance as the verdicts in the case. This Court, the district court, Judge Reed, clearly applied the test that this Court set forward. It applied the Henley case, as we set forth in our brief, and made clear. The Corso court also made clear that when it was receiving the statements of the witness jurors, it was taking them not in terms of whether the IRS agent's conduct could have affected the jurors' impartiality in receiving and reaching a verdict, but whether the agents could have impacted the jurors' impartiality to do such things as fairly and impartially receive the evidence, listen to the evidence, think about the evidence, pay attention to the Court's instructions and ability to deliberate. In this context, the district court properly determined that the defendant's new trial motion should be denied. The raise that I mentioned before The question I'd like to ask you, what's your response to counsel's argument that it's not simply affecting the verdict that matters, but if it affected the jurors' ability, for instance, to concentrate on a particular witness at a particular point in the trial, if a juror was intimidated during a portion of the trial, that that would be enough? Your Honor, that's certainly not the case we have here. The one particular juror, there was only one juror here who was even aware that any looking at or staring at jurors was going on, and that was Juror Walker. And Juror Walker testified, and this is on – give me a moment, please, Your Honor. I apologize. And when she was asked if there was any question about possible retaliation, she said, we joked about being audited. And this is on the direct examination from the defense. During that first week of time that you were intimidated, did it distract you? No, I don't think so. Just didn't look over there. Well, when you would think about it, though, when you're thinking about that, that or thinking about the trial, the trial, I didn't – I just – or both. I didn't. I just wouldn't look over there. Or I would be listening to the trial. These are from pages 19 and 20 of the transcript, Your Honor. So Juror Walker was not distracted. And indeed, the district court here in the case noted that and said that her possible distraction would not be a reason for granting the defendants a new trial motion. And she – again, she was the only one who presented any testimony that was even aware that there was any staring going on. So your answer was, as to whether it would be enough, your answer was that's not the case here. But what's your answer to the question of whether if a juror is distracted in any way during the course of the trial, is that sufficient or must the juror be affected with respect to the vote that she casts ultimately? Your Honor, mere distraction at an instance in the trial could not be sufficient. So if it affected her ability to pay attention to the witnesses, that would not be enough? A momentary distraction? I would have to say no. I mean, Your Honor – Okay. Let's say an hour's long distraction or a week's long distraction. There – it may be possible, Your Honor, but certainly here, certainly here where you have – you don't even necessarily – I mean, you don't have any manner of really distraction. And that's – I think that that's a very different circumstance than most of the other cases in this area, which are dealing with – dealing with bribes or attempts to buy jurors off and the like. I think we go down a very slippery slope if we start to say that a momentary stare or a periodic stare could result in new trials. I mean, you have – you have – here we have a 17 – a 16- or 17-day trial that lasted over the course of about four weeks. There were – there are so far – thus far, there have been district court judges who have held two, more than two, two-day hearings on this matter and has scrupulously followed the course. Well, let me ask you this. The judge found that the witness's testimony, the jury's testimony was credible. Yes, Your Honor. Although he had a problem with the timing as to one of the witnesses. But it was truthful. And he found that Jury Walker testified that she was intimidated, but only at the most, for the first two weeks of the trial, but that after that it didn't bother her. That's what the district judge said. So we're not talking about a moment of everything. We're talking about a juror who says she was intimidated at the most for the first two weeks of the trial and that after that she got used to it and it didn't bother her any longer. Well, in the first instance, Your Honor, the two weeks, those are – those would be times when we're talking – we're here in this case, we would have been talking about the government's case. In the defense case, these various experts are coming on, that came later. So they certainly were, if anything, if there were a distraction, which she said was not. The distraction would have occurred. It would not have hurt the government's case. It would have hurt the government's case. It would have hurt the government's case. That's correct, Your Honor. That's correct. I suppose there's cross. Yes. Counsel. Yes, Your Honor. Counsel, let me ask, do you think that this was tampering? No, Your Honor. Not at all. Do you think that the presumption of government must make a strong case was – is what the standard that the district court judge should have applied? Your Honor, I think on the facts of this case, Judge Reed did what this Court told him to do. We told him to decide whether to apply that standard, whether it should apply. That's correct, Your Honor. And he applied it, and he found that the very low standard that the presumption of prejudice applied, that there was a prima facie jury tampering as a result. But he then took it to the next step. Yes, we do, Your Honor. We find that we do not believe that looking at or staring at jurors in open court without any manner of communicative gesture cannot in any way be construed as jury tampering, and that that would be an alternative basis for this Court to rule. But the principal argument is that – our principal argument is that the veteran district court judge here did what this Court told him to do, and did it – did it properly, and there's been no showing, made his findings. The defense – the defense ignores the Court's findings. And, again, the district court – again, he has heard the – he heard the 17 days of trial testimony, and he's conducted this two – two rounds of hearings in the case. So you're saying the district court found not only that the verdict was unaffected,  but the course of the trial was unaffected? Ultimately, yes, that's right, Your Honor. He's saying – ultimately, he said there's no cognizable tampering or intimidation. So – and in terms of the affecting of the verdict, I mean, the – I mean, that's essentially what – Okay. What – what particularly in the district judge's findings are you thinking of when you say that the trial wasn't affected in any way? If I could point to, you know, the district court said, and this is at when after Ms. Walker's testimony, it says he wants to say that I'm receiving her testimony regarding the effect of the staring or glaring, tracking the Ninth Circuit language. It was to fairly and impartially receive the evidence, listen to the evidence, think about the evidence, pay attention to the evidence, and ability to deliberate at any time. I'm receiving that not from the standpoint to be – to be fair and impartial in making a decision, but to be fair and impartial in receiving the evidence and so on. So that's how he's tracking the language. And when he gets to the findings – when he's making his findings at the end, he goes through a similar – similar characterization. And then the Court correctly found that all the 11 jurors who testified – there will be 11 left, but one of them is dead – said they testified unconditionally, unhesitatingly, and resolutely in the Court's view, credibly, that the conduct of the agents did not affect the outcome of the case. Staring was harmless on that basis. Also, staring was harmless beyond a reasonable doubt, because there was no credible basis to infer here in the circumstances that the jurors would have hesitated to act because of the staring and its effects in matters of such importance as the verdicts in the case. What do you make of the testimony, which is a – you know, that all the test – they all testified credibly, that when Ms. Walker was asked, is it the case that because of the staring and glaring of the IRS agents that both you and the other jurors expressed a feeling of being uncomfortable? Yes. And is it also true that as a result of the staring and glaring, there was a concern expressed among your jury panel of retaliation by the IRS being audited? Yes. You testified in direct response to one of the questions that the sense of intimidation did not bother you as much as time went on. Do you recall that? Yes. It did remain with you, didn't it? Well, we knew they were there. It didn't bother me as much after the first week because I knew they were going to be sitting there. You think that shows that there was no effect? Your Honor, if we could – if I could continue with reference to testimony. Again, during the direct examination of Ms. Walker, counsel asked during the first time – first week that you were intimidated, did it distract you? No? I just didn't look over it. No, but I'm asking about the part that this caused them, not only her but the other jurors, to be concerned about being audited, the staring and the glaring. Your Honor, the testimony of the other jurors is that they were not aware of – you know, they were not aware of any staring. Well, he finds her testimony credible. Do you think that this part is not credible? No. I've just – I just would like to go through some of the – some of the other testimony in the case. I also note that the Court found that she was not distracted and that her possible distraction was not a basis to set aside the verdict in this case. As of pages 3 – she wasn't distracted at page 310. And then page 320 said it's possible district court seemed to – But what I'm trying to ask you is if the staring and glaring as she testified caused her to feel concern about being audited, and then she also testifies, however, I didn't let anything affect my vote, what is – what is the correct ruling with respect to that, if that were the effect? That she were – she was concerned by the staring and glaring made her worry about being audited, but then when she got to the point of making a vote, she puts that aside and says, I'm not going to worry about that. Your Honor, again, here, the most we have – the most we would have would be staring. But I think it's taken – You know, we didn't create this glaring theory. It's Judge Reed who found that this glaring occurred. The glaring at the court. Staring occurred. Staring. Staring and glaring. Stock and all, whatever it was. And, Your Honor, she was – Ms. Walker – first, Your Honor, with respect to your question, that's clearly not the – it's clearly not this case. What's not this case? The –  Your Honor, Ms. Walker said that she was concerned about being audited. She said that as a result of the staring and glaring, she was concerned about being audited. Now, she also says she put that – you know, it did not affect her vote. Your Honor, on cross, she said she was uncomfortable, not intimidated. She wasn't seriously concerned about being retaliated against by the IRS. They asked specifically, did the staring affect her ability to be fair and impartial? No, it didn't. She said, no, it didn't affect me. Did the staring distract you from receiving the evidence? There's no question she said she was intimidated, felt intimidated for the first two weeks or so. She said it didn't affect her ultimately as to what she did and how she performed. Your Honor, there's – there's other – you know, there's other testimony here that she was not – she was not seriously concerned about being retaliated against by the IRS. Did a concern about retaliation by the IRS adversely affect your ability to be fair and impartial? No. No. That's absolutely clear. No doubt about that. But she – she said she put that all aside and voted, you know, without regard to any of that. It did not affect her vote. It did not affect her, you know, acting in a fair and impartial manner. I think that's clear. But that wasn't the question. The question was, assuming she – it did not affect her vote, if it did cause concern to her, did it cause concern to her about being audited during the course of the trial? Does that matter? No, Your Honor. I – certainly – certainly in this case, it's our position it doesn't matter. There – there may come a case, but for Blair, staring doesn't – looking at her, staring doesn't do it. I think the problem is they're concerned up front about what the act was. Suppose the person is grabbed by the arm by an IR agent out in the hall, and then she says, I was affected momentarily. I was intimidated. But I put that aside, and in the end, I received all the evidence properly, and I made my decision. You know, because you keep focusing on the staring. That's not what Judge Reinhart's asking you about. He's asking, okay, assume an interference has occurred of some type. Then the question is, then what do we do? In that instance, Your Honor, where you would have – where you would have, you know – Okay. You're not answering the question. I wanted you to equate staring with somebody coming up to her and grabbing her by the arm in the hallway. You know, I wanted you to equate those two things and then answer the question. The Court found that it might, you know, that that act, make that an act, might prejudice the jurors. So at the first part of the testament, you have the presumption. That's right. He did. Then the Court went to the next step as to whether the government had shouldered  And so your answer is, I believe, is what you're trying to answer, is that just because a juror is affected by a tampering act at some time during the trial, if it doesn't affect essential things like receiving evidence and making an ultimate decision, then it doesn't change the outcome of the case. That's what you're saying. I think that's what you're saying. Yes, Your Honor. Okay. It's two different ways of looking at it. All right. All right. Thank you, counsel. Thank you. Yes. You have five minutes. I think it's important to note that during – at the very beginning of the hearing, I asked a number of questions or tried to ask questions, memory questions, to see what they remembered during the first part when they were being stared at. And the reason that I did that is because it's just not staring and glaring. It's at least, in my mind, 10 people staring and glaring and the testimony of other people up to 16. I counted, and there was 11 the last time I counted, and I don't know if there's still 11, on this side of the courtroom. I counted 11 people staring and glaring and looking at people not much further away or at this length, at these people. At the same time, evidence is being shown here. They have to look past me. You'd better talk into the microphone. Oh, I'm sorry. To these people staring and glaring. So I asked questions. To get to the question of what the effect of that is, there's no doubt that they're staring or glaring. The question is what effect did it have or did the government rebut any presumption that it had an effect? The government did not rebut the presumptions because they didn't ask any questions that would show that these people remembered what happened during that first week of trial, during an important stage of trial. The best part of our trial, they bring their trial on in the very beginning of the case, naturally. We cross-examined. We have two attorneys that have tried a lot of cases, cross-examining and doing a very good job at showing that these people had paid $110,000 overhand, overword, more than they should have paid, and going through all these things. What kind of tests did you do? Didn't Ms. Walker testify that she was not distracted? She testified that she wasn't distracted, but then we brought in a witness, Mrs. Wiseman, who testified that she went out to her house to get her affidavit. And this is in between the time of trial and the time she comes back and testifies. And she says to Mrs. Wiseman, and it's in the record and it's in the brief, I'm afraid to do this. I'm afraid they're going to take my house. I can't afford or have my house taken away from me. She comes back to court and says, it didn't affect me. In footnote 9 of your brief, you understood, you understood what happens. I'm afraid. I'm afraid. I've been here a lot of times. I get afraid every time I walk from that hotel where you come up the stairs and walk down here in the morning to come to these things. It scares me. Am I prepared? Am I ready? You're dealing with people that live out on ranches. The problem with Mrs. Wiseman's testimony is it's part of the evidence that the district court assesses in coming to his ultimate conclusion that Mrs. Walker wasn't affected. So the judge heard the testimony and obviously he thought it went to her state of mind at that particular time and not at the time of the trial. That seems to be what he concluded. And let me ask you a question now. And that is, can't the district judge conclude that? No. Why can't he weigh the evidence and conclude that the testimony in court is the one that he believes? Because under what you gave us, what you told us to do, if there is a risk, a chance that there was an effect and a chance means that that person, these people sitting over here for a second, for a minute, for five minutes, for a week, didn't understand what was going on, didn't understand that there were these lawyers that were sitting there stopping every bit of piece of information that was coming in. And she was distracted just a little bit by that. She has the right to not have that distraction. And to have 15 ñ I'm sorry. I see the difference between her being distracted for a little amount of time and the judge concluding that she was not. I mean, she can ñ I mean, you say there's a possibility she was, but the judge concluded she was not. But he didn't apply the right test. He applied a 34-year-old test. You told him to apply it. Well, I'm talking about he's making a factual determination. I don't think that's applying any test, is it? He's just ñ at that point, he's making a factual determination. What test is he applying? In his order, he said we look as directed by the court of appeals to the likely consequence of the steering, which ñ or whether or not the jurors admit that. That's in making his final conclusion. But before making his final conclusion, he makes some factual determinations. Right. And in the very beginning, he says we conclude on the basis of that test that the steering by the IRS agents at specific jurors was sufficiently serious that it might prejudice the jurors. Might. And in your ruling, in your ruling, you said is there a risk that it might. Risk was the word. Risk is the Henley word. And he said it right there. He said it. He found it. He found that it might. And every person in this country has a right to not have ten IRS agents in suits staring at them for a week of trial. And just one other thing. Ms. Clay, she testified in this testimony that nobody else noticed the steering. She said, I noticed the steering. I talked to her outside in the hall and said, did you notice the steering during this hearing? She said, yes. I noticed the steering. And how did it affect you? It was like looking in the mirror of my car and seeing a highway patrolman behind me, driving behind me. And I thought to myself, when I'm looking in the mirror and I see a highway patrolman driving behind me and I have my five kids, now there's down to three that stay with me or live at our house, and I think, what happens? Am I thinking of the kids or am I thinking of what I did wrong? And then I thought to myself this morning, that's a risk that I thought to myself, what about a week? A week of where you look in the mirror and they're following you. Thank you, counsel. You're out of time. Oh, thank you for giving me the time. Thank you for appearing in Savile Mail. I appreciate it. Thank you, counsel. Thank you. Thank you both very much. The case just argued will be submitted. The Court will stand in recess until 10 o'clock.
judges: B. Fletcher, Reinhardt, Restani